**James L. BOLDEN, Jr.,**
**Plaintiff–Appellant,**

v.

**PRC INC., formerly known as Planning Research Corporation, and Robert Carver, Defendants–Appellees.**

No. 93–3207.

United States Court of Appeals,
Tenth Circuit.

Dec. 23, 1994.

Rehearing Denied Jan. 31, 1995.

Brock R. Snyder, Law Office of Brock R. Snyder, Topeka, KS, for plaintiff-appellant.

Kirk T. May, Rouse, Hendricks, German, May & Shank, P.C., Kansas City, MO, for defendants-appellees.

Before BALDOCK and BRORBY, Circuit Judges, and REAVLEY,[*] Senior Circuit Judge.

BRORBY, Circuit Judge.

This is an employment discrimination case arising out of James L. Bolden Jr.'s employment with PRC Inc. Mr. Bolden alleged several violations of Title VII based upon racial discrimination. Mr. Bolden also alleged a pendent state claim of outrage. The district court dismissed the case by granting defendants' motion for summary judgment on each claim.

## STANDARD OF REVIEW

On review of a grant of summary judgment we review the record *de novo* drawing all reasonable inferences in favor of the nonmovant. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate only when the moving party shows there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To avoid summary judg-ment, the nonmovant must make a showing sufficient to establish an inference of the existence of each element essential to the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmovant "may not rest upon mere allegation or denials of his plead-ings." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). To go to trial there must be enough competent evidence to en-able a finding favorable to the nonmovant. We may affirm the grant of summary judg-ment for reasons other than those used by the district court as long as they are ade-quately supported by the record. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 528 (10th Cir.1994).

## BACKGROUND

Mr. Bolden, an African American, had worked as an electrician at PRC for eight years with Robert Carver as his immediate supervisor. The record portrays Mr. Bolden as a sensitive and serious person working in a shop filled with boorish churls. Eventual-ly, the torment from his coworkers became unbearable for Mr. Bolden, so he resigned his employment with PRC.

### Work Assignments

Mr. Bolden was hired and promoted on Mr. Carver's recommendations. During his first five years with PRC, Mr. Bolden was promoted three times: from Trainee Techni-cian to Technician C to Technician B and then to Technician II. Mr. Bolden usually received satisfactory performance evalua-tions. However, during one year of his work with PRC, Mr. Bolden received below aver-age evaluations. During that year, Mr. Bol-den had problems with tardiness and prob-lems working up to his potential; Mr. Bolden was rated as "needs some improvement" in most areas of the job.

Mr. Bolden applied for the position of Technician III but was denied this pro-motion. Mr. Carver, with the facility manag-er, Mr. Melander, made the promotion deci-sion based upon a numerical evaluation of the

---

[*] The Honorable Thomas J. Reavley, Senior Circuit Judge, Fifth Circuit, sitting by designation.

candidates and an interview of the top five applicants. In the numerical evaluation, Mr. Bolden ranked twenty-first out of twenty-two applicants and therefore was not granted an interview nor given the promotion.

As Mr. Bolden's supervisor, Mr. Carver made all of the work assignments. During the first two years of Mr. Bolden's employment with PRC, Mr. Carver assigned Mr. Bolden to work on old and delayed projects in a warehouse where other employees did not want to work. Throughout his employment, Mr. Bolden was assigned to work on unsophisticated projects. Mr. Bolden noted an incident in which his soldering project did not pass inspection while a less well soldered project by one of his coworkers did pass inspection. On another occasion, Mr. Bolden was given an assignment to repair an item that could not be properly fixed and normally would have been discarded.

### Work Atmosphere

Although the record on appeal shows Mr. Bolden was badgered frequently by several of his coworkers, Mr. Bolden alleges only two of his coworkers made overtly racial remarks. Barry Fiordimondo, a coworker, at least three years before Mr. Bolden's resignation, warned Mr. Bolden "you better be careful because we know people in [the] Ku Klux Klan." Mr. Fiordimondo also used terms such as "honky" and "nigger" in Mr. Bolden's presence. Mr. Fiordimondo drew a sad face cartoon and titled it "Junior makes the same pay as I do." Mr. Bolden interpreted this cartoon to be a racial attack directed at him as the only black person working in the shop at the time the picture was drawn. In his deposition, Mr. Bolden notes Mr. Fiordimondo was considered a joking type of person who often used the terms "honky" and "nigger" in the shop with respect to persons other than Mr. Bolden.

Another coworker, Michael Weinsaft, also allegedly made racial remarks directed at Mr. Bolden. Mr. Bolden cannot recall any of Mr. Weinsaft's racial slurs or jokes.

During the last year and a half of Mr. Bolden's employment with PRC, several of his coworkers began deriding him. Mr. Bolden kept a log of most of these incidents.

Mr. Bolden lists twenty incidents occurring over the eighteen-month period. On one occasion, Mr. Weinsaft walked over to Mr. Bolden's work area and expelled flatus directly at Mr. Bolden. Two other coworkers made flatulence jokes involving Mr. Bolden: One coworker expelled flatus and said, "[a] kiss for you Jim." Although such jokes were a common occurrence in the shop, Mr. Bolden was the sole recipient of such direct gas from Mr. Weinsaft.

Other coworkers called Mr. Bolden names. He was referred to as "dickhead," "dumbshit," "asshole," "faggot," and "fool." During a lunch break, an unidentified coworker rigged Mr. Bolden's chair so the back would fall off when Mr. Bolden leaned against it. One coworker told Mr. Bolden "to go to hell [and he] hopes [his] family goes there with [him], along with [his] dog." One morning on his way into work, Mr. Bolden encountered a coworker leaving the building. Mr. Bolden jokingly said, "[G]oing the wrong way aren't you?" In response, the coworker called Mr. Bolden a fool and kept on walking. The final provocation, resulting in Mr. Bolden's resignation, was when a coworker violently pushed Mr. Bolden after they accidentally bumped into each other.

Mr. Bolden describes the workshop as a "joking" environment where most of the workers made jokes and were the targets of joking behavior. Mr. Bolden notes he does not like to joke at work. He is a serious, literal-minded person. Mr. Bolden also presents evidence about his religion and about how some of his coworkers may have been aggressive toward him in response to his strongly-held religious beliefs.

### Mr. Bolden's Complaints to His Supervisors

Mr. Bolden was tormented at work, yet often he did not notify his supervisors about what was happening. Some events he did report. However, he did not alert his supervisor he felt he was being harassed because of his race.

Mr. Bolden reported the "Junior makes the same pay I do" cartoon to Mr. Carver; however, Mr. Bolden did not tell Mr. Carver

he perceived the cartoon as a racial attack. Mr. Bolden never reported to his supervisors the Ku Klux Klan comment nor the racial slurs made by Mr. Fiordimondo. Although Mr. Bolden clearly remembers no supervisors were present when Mr. Weinsaft made racial jokes, Mr. Bolden never reported this behavior by Mr. Weinsaft.

Mr. Bolden did not complain about any of the flatulence until Mr. Weinsaft directly expelled flatus at Mr. Bolden's workbench. Mr. Bolden was not satisfied with Mr. Carver's response to his complaint because Mr. Weinsaft's pay was not reduced. Mr. Bolden reported to his supervisors some of the name-calling, which ceased as soon as the supervisors became aware of and responded to the problem. Mr. Bolden complained about being told to go to hell and never had any problems with that employee again. Mr. Bolden also reported the shoving incident, however not prior to his resignation.

When management did learn of Mr. Bolden's problems in the shop, the supervisors confronted the offending coworker. On one occasion, Mr. Melander called the offending coworker to the front office to meet with management. Mr. Bolden does not know what management said to this rude coworker; however, he noted it worked. When Mr. Carver learned Mr. Weinsaft had expelled flatus at Mr. Bolden's workbench, Mr. Carver reprimanded Mr. Weinsaft and placed a memorandum of reprimand in Mr. Weinsaft's personnel file.

Approximately one year before Mr. Bolden resigned, he filed a charge of discrimination with the Kansas Commission on Civil Rights and the Federal Equal Employment Opportunity Commission. At the settlement conference with the Kansas Commission on Civil Rights, Mr. Melander and Mr. Carver learned for the first time about the racial slurs Mr. Fiordimondo had used one or two years earlier. In response to this information, Mr. Melander confronted Mr. Fiordimondo. Mr. Melander then held a meeting with all workshop employees. Without revealing to the employees Mr. Bolden had filed a complaint, Mr. Melander informed the workers discrimination would not be tolerated at PRC and the workers must treat one another with respect and dignity. After this meeting, Mr. Fiordimondo and Mr. Weinsaft did not make racial jokes or slurs again; neither of them bothered Mr. Bolden again.

## DISCUSSION

The district court granted the defendants' motion for summary judgment on all claims. The court found the badgering of the plaintiff was "commonplace of the blue collar environment of the electronics shop." Memorandum & Order at 8. The court also concluded the "evidence shows only isolated and sporadic racial comments." Memorandum & Order at 7–8. As to the state law claim of outrage, the court noted "some of the behavior was cruel, crude and unthoughtful, [but not] so extreme as to permit plaintiff to pursue an outrage claim under Kansas law." Memorandum & Order at 14.

Mr. Bolden appeals the district court's summary judgment determination. Mr. Bolden specifically challenges the district court's holdings that (1) a racially hostile environment did not exist, (2) Mr. Bolden was not constructively discharged, (3) the failure to promote Mr. Bolden was not disparate treatment, and (4) the state claim of outrage fails.

### Hostile Work Environment

Mr. Bolden asserts the reasonable inferences drawn from the facts he has shown support a claim of racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964. The district court found the evidence insufficient to support such a claim. Specifically, the district court found the evidence shows only isolated and sporadic racial comments, jokes, or slurs and found this insufficient to establish a racially hostile environment.

Although hostile work environment is not explicitly mentioned in Title VII, it is well established a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. § 2000e–2(a)(1). See, e.g., Griffith v. Colorado, Div. of Youth Serv., 17 F.3d 1323 (10th Cir.1994); Hicks v. Gates Rubber Co., 928 F.2d 966 (10th Cir.1991). To constitute actionable harassment, the conduct must be

"sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment,'" *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). The Supreme Court also explains an employer who does not actively engage in the harassment may be liable under agency principles. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408.

 For Mr. Bolden's harassment claim to survive summary judgment, his facts must support the inference of a racially hostile environment, *See Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06, and support a basis for liability, *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1417–18 (10th Cir.1987). Specifically, it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06, and (2) the harassment was racial or stemmed from racial animus. General harassment if not racial or sexual is not actionable. The plaintiff must show " 'more than a few isolated incidents of racial enmity.'" *Hicks,* 833 F.2d at 1412 (quoting *Snell v. Suffolk Co.,* 782 F.2d 1094, 1103 (2d Cir.1986)). Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. *Id.* at 1412–13 (citing *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981)).

The blatant racial harassment of Mr. Bolden came from only two of his coworkers on a couple of occasions. The racial jokes and slurs were infrequent. In the eight years Mr. Bolden worked at PRC, he complains of only two overtly racial remarks (the Ku Klux Klan comment and the use of the term "nigger") and one arguably racial comment (the sad face cartoon). Because the racial comments were not pervasive, they are insufficient to be actionable. However, we must consider the totality of the circumstances and therefore consider the racial comments along with the general ridicule of Mr. Bolden by the other coworkers.

The general ridicule became prevalent two years after Mr. Fiordimondo made the overt racial invectives. None of the general ridicule was overtly racial. Mr. Bolden explained in his deposition the workshop had a "joking" atmosphere. Many of the workers harassed one another; many of the workers were the recipients of such jokes. The derisive environment in the workshop was universal; Mr. Bolden was not singled out for abuse. Mr. Bolden notes for the court, others in the shop were badgered as he was. The only difference, revealed in the record, between Mr. Bolden and the rest of the shop was that Mr. Bolden could not tolerate the taunting. Mr. Bolden did not share the crude and rude sensibilities of his coworkers.

 Mr. Bolden has not presented evidence of " 'a steady barrage of opprobrious racial comment,'" as required to show a racially hostile work environment. *Hicks,* 833 F.2d at 1412–13 (quoting *Johnson,* 646 F.2d at 1257). It is clear from the record Mr. Bolden was unhappy at work; however, general torment and taunting if not racially discriminatory are not actionable. There is no evidence in the record concerning the racial makeup of the workshop, whether Mr. Bolden was the only African American in the shop, or whether the other recipients of such general taunting were African American. Mr. Bolden's workplace was permeated with "intimidation, ridicule, and insult"; however, the record reveals the intimidation, ridicule, and insult were directed indiscriminately, not targeted at Mr. Bolden due to his race. Thus, we conclude Mr. Bolden's claim of racial harassment fails because he has not shown he was singled out for abuse and has not shown the ridicule he faced stemmed from racial animus. We do not mean to suggest a plaintiff's claim will necessarily be defeated if the plaintiff works in a place where several of the workers are taunted. Our holding in this case is narrow. Mr. Bolden failed to survive the summary judgment motion, because he did not present evidence to support the inference of pervasive racial harassment.[1] *See Meritor,* 477

---

1. Even if the record could support the inference that racial harassment was pervasive, Mr. Bolden must establish a basis of liability for PRC and Mr. Carver. The persecution in this case

U.S. at 65. Accordingly, we affirm the grant of summary judgment on the claim of racial harassment.

### Constructive Discharge

■ An employee who is not formally discharged from employment may still be constructively discharged if the employee was forced to quit due to race-based, intolerable working conditions. *Derr v. Gulf Oil Corp.*, 796 F.2d 340 (10th Cir.1986). Mr. Bolden claims he was constructively discharged and claims the district court erred in finding the evidence insufficient to show conditions were intolerable for him.

■ Based upon our analysis of Mr. Bolden's hostile environment contention, we must affirm the district court's order. Mr. Bolden has not raised the inference the taunting and heckling stemmed from racial animus. We cannot infer racial animus under the facts of this case because Mr. Bolden has not shown the race of his tormentors nor the racial makeup of the workshop; Mr. Bolden was not singled out for abuse; and, the general badgering of Mr. Bolden occurred on a limited basis of approximately one incident per month.

Mr. Bolden has shown he was unhappy at work and he resigned because he could not deal with the taunting any longer. However, not every unhappy employee has an actionable claim of constructive discharge pursuant to Title VII. Mr. Bolden has failed to show how his resignation was the result of illegal discriminatory conduct. *See Acrey v. American Sheep Indus. Ass'n*, 981 F.2d 1569, 1573–74 (10th Cir.1992). Therefore, the district court did not err in granting summary judgment in favor of PRC and Mr. Carver on this issue.

### Disparate Treatment in the Failure to Promote

Mr. Bolden asserts the district court erred in determining the claim of disparate treatment in failure to promote was untimely and was not administratively exhausted. Mr. Bolden had filed a complaint with the Kansas Commission on Civil Rights and the Equal Employment Opportunity Commission on May 3, 1989, amended in June 1989, alleging unequal treatment and unspecified failure to promote due to illegal discrimination. The charge was investigated and disposed of by each Commission. Mr. Bolden applied for the promotion to Technician III in April 1990, almost a year after he filed his complaints with the civil rights Commissions.

■ To bring a Title VII cause of action, an employee must file a discrimination charge with the state agency within 300 days after the alleged discriminatory act occurred. 42 U.S.C. § 2000e–5(e). An aggrieved employee may not maintain a Title VII suit in federal court unless the employee has "pursued [these] avenues of potential administrative relief." *Love v. Pullman Co.*, 404 U.S. 522, 523, 92 S.Ct. 616, 617, 30 L.Ed.2d 679 (1972). An exception to the administrative exhaustion rule is "that acts committed pursuant to a pattern of discrimination challenged in an [Equal Employment Opportunity Commission] complaint, but occurring after its filing, [if] reasonably related

was coming from the workers not directly from the company nor from the supervisors. Three possible sources of liability for PRC and Mr. Carver are (1) the persecution occurred within the scope of the coworkers' employment, (2) the employer acted negligently or recklessly in failing to recognize and deal with the cruelty levied against Mr. Bolden, and (3) the coworkers in their abuse of Mr. Bolden acted under apparent authority of the employer. *See Griffith*, 17 F.3d at 1330 (considering employer's liability for supervisor's sexual harassment).

Of the three possible sources of liability only the second one, the employer acted negligently or recklessly in failing to deal with the taunting of Mr. Bolden, is arguably applicable in this case. The record does not reveal Mr. Carver or PRC acted negligently or recklessly in failing to recognize and deal with Mr. Bolden's torment within the workshop. Mr. Bolden admits he often did not complain to Mr. Carver about his social problems in the workshop and he never shared with any of the supervisors his belief he was treated poorly because of his race. Moreover, nothing in the record suggests Mr. Carver and PRC should have been aware of the treatment of Mr. Bolden by his coworkers. Mr. Bolden usually did not inform them of his treatment. When the supervisors learned of Mr. Bolden's unhappiness they always resolved the problem. Mr. Bolden has not shown facts supporting an inference Mr. Carver or PRC acted negligently in failing to recognize and resolve the poor treatment of Mr. Bolden.

to that complaint, ... may be challenged in district court without filing another [Equal Employment Opportunity Commission] complaint." *Brown v. Hartshorne Pub. Schl. Dist. No. 1,* 864 F.2d 680, 682 (10th Cir.1988); *Archuleta v. Colorado Dept. of Inst.,* 936 F.2d 483, 488 (10th Cir.1991).

■ Mr. Bolden's civil rights charge filed with the Kansas Commission on Civil Rights in 1989 contained the allegation that Mr. Bolden was denied several promotions due to his race. However, the record does not reveal of which promotion denials Mr. Bolden complained. From the district court's order, we learn Mr. Bolden was upset about the denial of two promotions before the 1990 promotion. The first promotion was for Senior Engineering Technician in July 1987. The district court found Mr. Bolden failed to file a charge of discrimination within 300 days after the denial of this promotion. We glean from the district court's finding this promotion was not part of the administrative civil rights complaint. The second promotion sought was for Senior Technical Writer in September 1989. This denial occurred after Mr. Bolden filed his complaint; therefore, we can assume this promotion also was not part of his Kansas Commission on Civil Rights complaint.[2] We are left with no evidence of the kind of promotions Mr. Bolden complained of to the Commissions; therefore, we cannot find the denial of the 1990 promotion was reasonably related to the complaint. Mr. Bolden simply has presented no evidence to show us what was in the complaint beyond the general allegation he was denied promotions because of his race.

We agree with the district court Mr. Bolden failed to file a timely charge of discrimination concerning the denial of promotion to Technician III. Also, Mr. Bolden has failed to show how his claim fit into the exception to the administrative exhaustion rule. Accordingly, we affirm the district court's dismissal of this claim.

**2.** As an important aside, Mr. Bolden's record on appeal discloses Mr. Bolden did not apply for the

### Tort of Outrage

Mr. Bolden also appeals the district court's dismissal on the merits of his pendent state claim of outrage—intentional infliction of emotional distress. The district court decided to resolve the state claim on its merits because "substantial time and energy has been expended in this case, and plaintiff's pendent claim does not pose any novel or unsettled questions of law." Memorandum & Order at 12. The district court determined the record fails to show extreme and outrageous conduct sufficient to sustain a claim of outrage. Memorandum & Order at 14.

■ The Kansas tort of outrage requires (1) conduct of defendant must be intentional or in reckless disregard of the plaintiff, (2) conduct must be extreme and outrageous, (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress, and (4) plaintiff's mental distress must be extreme and severe. *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986) (relying on *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175 (1981)), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). The threshold inquiries for the tort of outrage are whether (1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery and (2) the emotional distress suffered by the plaintiff is so extreme the law must intervene because no reasonable person would be expected to endure it. *Roberts v. Saylor,* 637 P.2d at 1179.

■ Although the common law tort of outrage holds the defendant liable for the defendant's extreme and outrageous behavior, *see Saylor,* 637 P.2d at 1179, Mr. Bolden bases his outrage claim on the actions of his coworkers, not on the actions of Mr. Carver or PRC. He does not allege Mr. Carver or PRC directly participated in the name-calling and teasing. Nor does he allege the ridicule was within the scope of his coworkers' employment. In effect, Mr. Bolden argues PRC

position of Senior Technical Writer.

and Mr. Carver are vicariously liable for the allegedly outrageous behavior of the coworkers. However, Mr. Carver does not support this argument with any factual evidence.

Mr. Bolden claims Mr. Carver and PRC should have known of the harassment of Mr. Bolden. Mr. Bolden explains the workshop was small and therefore Mr. Carver must have been aware of the derision. However, there is no evidence in the record about the size or conditions of the workshop. Similarly, there is no evidence presented to this court regarding Mr. Carver's presence in the workshop. Mr. Bolden has presented no evidence to support his claim of the defendants' tort liability. We cannot simply assume the allegations in his brief to this court are true if there is no showing to support such allegations in the record on appeal. *See Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir.) (to avoid a properly supported summary judgment motion, the nonmovant must do more than refer to allegations in the brief), *cert. denied,* — U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992).

Mr. Bolden has failed to bring to this court's attention any Kansas tort of outrage case in which an employer was held liable for the outrageous conduct of an employee. Mr. Bolden does rely on *Gomez v. Hug,* 7 Kan. App.2d 603, 645 P.2d 916 (1982), in which an employer was held liable for the tort of outrage. However, in *Gomez,* it was the employer, not the coworkers, who subjected the employee to vulgar, racist expressions and threats of violence.

■ Even if Mr. Bolden could demonstrate how Mr. Carver and PRC were liable for the coworkers' behavior, the behavior of the coworkers would have to be extreme for Mr. Bolden to prevail on this claim. Kansas has adopted the Restatement, Second, Torts § 46 as its common law tort of outrage. *See Saylor,* 637 P.2d at 1179. To succeed on a claim of outrage, as a threshold matter, Mr. Bolden must show the conduct of Mr. Bolden's coworkers may reasonably be regarded as so extreme and outrageous as to permit recovery and show he suffered emotional distress so severe the law must intervene because no reasonable person would be expected to endure it. *Moore,* 729 P.2d at 1211.

"[M]ere insults, indignities, threats, annoyances, petty expressions, or other trivialities" do not rise to the level of outrageous conduct. *Saylor,* 637 P.2d at 1179. "Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Id.*

The Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims; only in *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982), did the Kansas courts allow such a claim. In *Gomez,* the plaintiff was subjected to vulgar, racist expressions and threats of violence resulting in possible serious medical problems. 645 P.2d at 918. The United States District Court in Kansas, in the case of *Laughinghouse v. Risser,* 754 F.Supp. 836 (D.Kan.1990), also found an employee adequately alleged the tort of outrage so as to survive summary judgment. In *Laughinghouse,* the plaintiff was the victim of sexual harassment from her supervisor described as "a concerted effort to terrorize her and to intentionally break her spirit." 754 F.Supp. at 843. The court in *Laughinghouse* found the nature of the abuse coupled with its constancy sufficiently demonstrated an outrage claim. *Id.* at 844.

■ The abuse of Mr. Bolden in the workshop was not constant and did not rise to the level of threats and abuse in *Gomez* and *Laughinghouse.* Mr. Bolden was called "asshole," "dumbshit," "faggot," and "fool." Although inappropriate and unnerving, this conduct was not extreme and utterly intolerable. Also, Mr. Bolden was not alone in facing such insults; almost everyone in the shop was called such names and similarly badgered. As the *Saylor* court stated, "[T]he law should not intervene where someone's feelings merely are hurt." 637 P.2d at 1179. Mr. Bolden was unhappy in the workshop and his feelings were hurt; however, that is insufficient to sustain a claim of outrage.

Mr. Bolden has failed to demonstrate how the employer and supervisor could be held liable for the conduct of his coworkers. Mr.

Bolden has not shown Mr. Carver or PRC acted intentionally or recklessly. Also, the conduct of the coworkers was not so extreme and outrageous as to permit recovery. Therefore, we agree with the district court: Mr. Bolden's claim of outrage—intentional infliction of emotional distress—fails on the merits.

## CONCLUSION

The evidence reveals Mr. Bolden was treated very poorly at his job by his coworkers. He was met with hostility by many of his coworkers. Mr. Bolden worked with a group of people who had very different sensibilities about humor, which Mr. Bolden did not share. He had been the target of ridicule for a long time, and he was made unhappy by this work environment. However, Mr. Bolden has failed to meet his burden of proof by demonstrating the "harassment" was racially motivated. The workshop was a hostile environment; however, the record does not show it was a racially hostile environment. Mr. Bolden has failed to sufficiently show the existence of the elements essential to his claims. Because Mr. Bolden's claims cannot survive the defendants' summary judgment motion, we **AFFIRM** the order of the district court.